COMPLAINT UNDER 42 USC §1983, CIVIL RIGHTS ACT-TDCJ-ID (Rev. 2/08)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE** <u>EASTERN</u> **DISTRICT OF TEXAS**
<u>TYLER</u> **DIVISION**

CLERK, U.S. DISTRICT COURT
RECEIVED
APR 0 3 2017
EASTERN DIST. OF TEXAS

CHRISTOPHER BRYAN TORRES #1142645
Plaintiff's name and ID Number

TEXAS DEPARTMENT OF CRIMINAL JUSTICE-C.I.D.,
WYNNE UNIT
Place of Confinement

CASE NO. <u>6:17cv196</u>
(Clerk will assign the number)

*KWS/JDL*

v.

BRAD LIVINGSTON
P.O. BOX 99, Huntsville, TX 77342
Defendant's name and address

WILLIAM STEPHENS
P.O. BOX 99, Huntsville, TX 77342
Defendant's name and address

KELVIN SCOTT
#2 BACKGATE RD., Tennessee Colony, TX 75803
Defendant's name and address
( DO NOT USE "ET AL.")

## INSTRUCTIONS - READ CAREFULLY

**NOTICE:**

**Your complaint is subject to dismissal unless it conforms to these instructions and this form**.

1.   To start an action you must file an original and one copy of your complaint with the court.  You should keep a copy of the complaint for your own records.

2.   Your complaint must be <u>legibly</u> handwritten,  in ink, or typewritten.  You, the plaintiff, must sign and declare under penalty of perjury that the facts are correct.  If you need additional space, **DO NOT USE THE REVERSE SIDE OR BACK SIDE OF ANY PAGE.**  ATTACH AN ADDITIONAL BLANK PAGE AND WRITE ON IT.

3.   You must file a separate complaint for each claim you have unless the various claims are all related to the same incident or issue or are all against the same defendant, Rule 18, Federal Rules of Civil Procedure.  Make a short and plain statement of your claim, Rule 8, Federal Rules of Civil Procedure.

4.   When these forms are completed, mail the original and one copy to the Clerk of the United States Court for the appropriate District of Texas in the Division where one or more named defendants are located, or where the incident giving rise to your claim for relief occurred. The list labeled as "VENUE LIST" is posted in your unit law library. It is a list of the Texas prison units indicating the appropriate District Court, the Division and an address list of the Divisional Clerks.

EDGAR BAKER, JR.
2664 F.M. 2054, Tennessee Colony, TX 75886

TODD FUNAI
2664 F.M. 2054, Tennessee Colony, TX 75886

FRANCES SIMS
2664 F.M. 2054, Tennessee Colony, TX 75886

MR. HENSLEY
2664 F.M. 2054, Tennessee Colony, TX 75886

**FILING FEE AND IN FORMA PAUPERIS**

1.   In order for your complaint to be filed, it must be accompanied by the filing fee of $350.00.

2.   If you do not have the necessary funds to pay the filing fee in full at this time, you may request permission to proceed *in forma pauperis*.   In this event you must complete the application to proceed *in forma pauperis (IFP)*, setting forth information to establish your inability to prepay the fees and costs or give security therefor.   You must also include a current six (6) month history of your Inmate Trust Account.   You can acquire the application to proceed IFP and appropriate Inmate Account Certificate from the law library at your prison unit.

3.   28 U.S.C. 1915, as amended by the Prison Litigation Reform Act of 1995 (PLRA), provides, "...if a prisoner brings a civil action or files an appeal *in forma pauperis,* the prisoner shall be required to pay the full amount of a filing fee."   Thus, the Court is required to assess and, when funds exist, collect, the entire filing fee or an initial partial filing fee and monthly installments until the entire amount of the filing fee has been paid by the prisoner. If you submit the application to proceed *in forma pauperis* , the Court will apply 28 U.S.C. 1915 and, if appropriate, assess and collect the entire filing fee or an initial partial filing fee, then monthly installments from your Inmate Account, until the entire $350 filing fee has been paid.

4.   If you intend to seek *in forma pauperis* status, then do not send your complaint without an Application to Proceed IFP, and the Certificate of Inmate Trust Account.   Complete all the essential paperwork before submitting it to the Court.

5.   **The complaint can not exceed 20 pages which includes all attachments.**

**CHANGE OF ADDRESS**

      It is your responsibility to inform the Court of any change of address and its effective date.   Such notice should be marked **"NOTICE TO THE COURT OF CHANGE OF ADDRESS"** and shall not include any motion (s) for any other relief.   Failure to file a NOTICE TO THE COURT OF CHANGE OF ADDRESS may result in the dismissal of your complaint pursuant to Rule 41(b), Federal Rules of Civil Procedure.

I.   PREVIOUS LAWSUITS:

      A.   Have you filed *any* other lawsuits in state or federal court relating to your
              imprisonment?                                                                             ___YES   _**X**_NO
      B.   If your answer to "A" is "yes," describe each lawsuit in the space  below.   (If there is more than one
              lawsuit, describe the additional  lawsuits on another piece of paper, giving the same information.)

              1.   Approximate date of filing lawsuit:_____

              2.   Parties to previous lawsuit:
                    Plaintiff(s)_____
                    Defendant(s)_____

              3.   Court: (If federal, name the district; if state, name the county.) _____

              4.   Docket Number:_____

              5.   Name of judge to whom case was assigned:_____.

6.  Disposition:  (Was the case dismissed, appealed, still pending?) _____

7.  Approximate date of disposition: _____

II.  PLACE OF PRESENT CONFINEMENT: TDCJ-CID's WYNNE UNIT _____

III.  PARTIES TO THIS SUIT:

A.  Name and address of plaintiff: CHRISTOPHER BRYAN TORRES, a/k/a Christopher Muhammad, WYNNE UNIT, 810 F.M. 2821, Huntsville, TX 77349 _____

B.  Full name of each defendant, his official position, his place of employment, and his full <u>mailing</u> address.

Defendant #1: BRAD LIVINGSTON, **former** Exec. Dir., TDCJ

P.O. BOX 99, Huntsville, TX 77342

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.

Failed to protect me from attack by fellow prisoner

Defendant #2: WILLIAM STEPHENS, **former** Dir. of TDCJ-CID,

P.O. BOX 99, Huntsbille, TX 77342

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.

Failed to protect me from attack by fellow prisoner

Defendant #3: KELVIN SCOTT, **former/current** TDCJ-CID's Region II Director, #2 Backgate Rd., Tennessee Colony, TX 75803

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.

Failed to protect me from attack by fellow prisoner

Defendant #4: EDGAR BAKER, JR., **former** Sr. Warden, MICHAEL UNIT 2664 F.M. 2054, Tennessee Colony, TX 75886

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.

Failed to protect me from attack by fellow prisoner

Defendant #5: TODD FUNAI, **former/current** Major, MICHAEL UNIT 2664 F.M. 2054, Tennessee Colony, TX 75886

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.

Failed to protect me from attack by fellow prisoner

Defendant #6: FRANCES SIMS, **former/current** Lieutenant, MICHAEL
UNIT, 2664 F.M. 2054, Tennessee Colony, TX 75886
Failed to protect me from attack by fellow prisoner


**Defendant:** #7: MR. HENSLEY, **former** Correctional Officer, MICHAEL
UNIT, 2664 F.M. 2054, Tennessee Colony, TX 75886
Failed to protect me from attack by fellow prisoner

IV.   STATEMENT OF CLAIM:

State here in a short and plain statement the facts of your case, that is, what happened, where did it happen, when did it happen, and who was involved.  Describe how <u>each</u> defendant is involved.  <u>You need not give any legal arguments or cite any cases or statutes</u>.  If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.  Attach extra pages if necessary, but remember that the complaint must be stated briefly and concisely.  IF YOU VIOLATE THIS RULE, THE COURT MAY STRIKE YOUR COMPLAINT.

1. On Saturday, June 27th, 2015, while performing part of my job duties as an inmate janitor (referred to as an "SSI") in the administrative segregation ("ad. seg.") building of TDCJ-CID's MICHAEL Unit in Tennessee Colony, Texas, I was stabbed in the neck by a fellow prisoner whose last name is "Sanchez."

2. Sanchez was an inmate housed in D-Pod, 8 cell of MICHAEL's ad. seg. building.

3. MICHAEL's ad. seg. building has six "Pods" (Pods "A" thru "F"), each Pod having six sections of cells, each section having two rows of seven single-man cells: Every Pod has eighty-four cells.

4. With the exception of F-Pod, everyday each Pod was assigned just **two**

RELIEF: State briefly exactly what you want the court to do for you.  Make no legal arguments.  Cite no cases or statutes.

Request Declaratory Judgment and nominal, compensatory, and punitive damages; also request jury trial on all issues triable by jury.

V.   GENERAL BACKGROUND INFORMATION:

A.  State, in complete form, all names you have ever used or been known by including any and all aliases:

Chris Torres, Christopher Muhammad, Luna

B.  List all TDCJ-ID identification numbers you have ever been assigned  and all other state or federal prison or FBI numbers ever assigned to  you, if known to you.
TDCJ #1142645, FBI #5341lWA7

VI.   SANCTIONS:

A.  Have you been sanctioned by any court as a result of  any lawsuit you have filed?          ____YES  X  NO

B.  If your answer is "yes", give the following  information for every lawsuit in which sanctions  were imposed. (If more than one, use another piece of paper and answer the same questions.)

1.  Court that imposed sanctions (if federal, give the district and division): _____

2.  Case Number:_____

3.  Approximate date sanctions were imposed:_____

4.  Have the sanctions been lifted or otherwise satisfied?          ____YES ____NO

4

**STATEMENT OF CLAIM** (continued)

guards per shift; one guard ("floor officer") worked on the Pod's floor, the other worked in the Pod's control picket ("picket officer"). Some days F-Pod had two floor officers and a picket officer.

5. On the shift I was assigned to work on, there were six SSIs in charge of cleaning the Pods---one SSI per Pod. I was assigned to F-Pod.

6. My job duties as an SSI in MICHAEL's ad. seg. building included sweeping, mopping, emptying trash cans, and according to the "Safety sheet" I had to sign when first working in there, there was a sentence that said something about "I shall obey orders of the ad. seg. guards."

7. On June 27th, 2015, after I finished helping the F-Pod floor officer feed ad. seg. inmates housed there, I left F-Pod to get some "hyper-caloric" snacks from the ad. seg. kitchen for some diabetic inmates on F-Pod, and as I passed by D-Pod on my way to the said kitchen, Defendant Mr. Hensley ("Hensley"), who was the floor officer that day on D-Pod, told me to come help him feed the ad. seg. inmates on D-Pod whenever I finished bringing the snacks to the F-Pod inmates. For whatever reason, there was no SSI for D-Pod that morning.

8. When I began helping Hensley feed the D-Pod inmates, Hensley did as most all other floor officers do during ad. seg. feeding times on the MICHAEL Unit, and on the Units of TDCJ-CID's Region Two, and on Units throughout all of TDCJ: 'Hensley would simply just open the food tray slot doors of every cell (one right after

Page 4A

another) on a particular row of seven cells, then he would wait
at the end of that row while I would have to hand each ad. seg.
inmate a food tray through their opened food slot (or just leave
it on their opened food slot if they were not at the slot) and
I would have to come back shortly later with a bucketful of
drink and pour a cupful of it into the cups of said ad. seg.
inmates who would be holding their cups through their opened
food slot; the food slots of MICHAEL's ad. seg. cell doors were
about five inches wide by 1½ feet long.

9.  Many times (during feeding times) while the said food slots
were still opened, the ad. seg. inmates would ask the floor
officer to pass things (like books, newspapers, magazines, photo
albums, food, etc.) back and forth the cells on that said row
being fed, and most of the times the floor officer would answer
the ad. seg. inmates by saying something like, 'Have the SSI do
it for you,' and I (or other SSI working) would pass whatever
the ad. seg. inmate requested to be passed.

10. After I (and/or another SSI) would finish handing a tray to, and
pouring a drink into the cup of, every ad. seg. inmate through
their opened food slot, and after passing things back and forth
on that row, the floor officer would quickly come by and quick-
ly close every food slot (one right after another) and then the
floor officer and I would go to the next row of cells and feed
those ad. seg. inmates just like in ¶¶ 8 and 9.

11. When the floor officers fed just like in ¶¶ 8 and 9, there would
be no supervisor present until after the ad. seg. inmates were
all fed; only then would the supervisors make their rounds.'

Page 4B

12. On June 27th, 2015, when I began helping Hensley feed on D-Pod, there was no supervisor present.

13. We fed in the manner in ¶ 8 on Section One, Row One, and Hensley gave the usual "Have the SSI do it for you" response to those inmates when they requested to have things passed from one cell to another while the food slots were opened, and when Hensley and I finished on that row, we proceeded to feed Two Row the same way.

14. Hensley was a few steps ahead of me when I got to Two Row, and when he opened the food slot of Sanchez's cell door I seen Sanchez put an entire arm out through his opened food slot, and while Sanchez used that said arm to point down towards some pictures that lay on the floor just outside Sanchez's cell door I heard Sanchez ask Hensley to get the said pictures for him (Sanchez) and then I seen and heard Hensley tell Sanchez that "the SSI (which was me) will get it for you. Ask him."

15. As Hensley went quickly towards cells 9 through 14 to quickly open each of those cells' food slot, I was then in front of Sanchez's cell and I handed him his lunch tray and Sanchez then asked me to get the said pictures.

16. Since Hensley had me pass things back and forth on Row One, and since I heard Hensley tell Sanchez to ask me to get the pictures, and since I felt sorry for Sanchez (because he appeared harmless and spoke in the right tone), I reached down to get the pictures.

17. As I reached down to attempt to get the pictures off the floor, Sanchez stabbed me on the right side of my neck with what appear- ed to be about a two-foot-long pole (made out of tightly rolled

up newspaper or magazine pages) which had about a four-inch, sharpened, barbed-tip nail on it.

18. I felt the nail hit my neck bone, and according to the surgeon's report (at East Texas Medical Center in Tyler, Texas where I had to be airlifted to), the nail went right between the carotid artery and the internal jugular vein, and I now have a visible three-inch-long scar from the surgeon's incision.

19. Within about a week of the said June 27th, 2015 stabbing, a lady who told me she was an official with the TDCJ-OIG (Office of Inspector General) interviewed me about the said stabbing incident.

20. The said OIG official said her name was Ms. Gray (or Grey) and during her interview of me, she insisted that I give her a written statement about what happened, which I finally did give (a brief one), and she said to me that the **"ONLY"** thing I could do about the stabbing incident is press **"CRIMINAL"** charges on Sanchez, which I interpreted as her representing that I could **NOT** grieve the dangerous working conditions that led to me being stabbed.

21. At the time of the said interview, I lost 95% of my voice and was unable to talk normally; if I did talk, I had to do so with alot of effort and I would get dizzy after about a minute of talking, and I would run out of breath before completely saying a sentence.

22. From the time I awoke from the surgery (to remove the nail out of my neck) on June 27th, 2015, to about the time I had to have further surgery in late September 2015 (to semi-fix the para-

lyzed right vocal cord), my mind was clouded because I am in prison for something I did **NOT** do and then I thought I would forever no longer have my normal voice back, and I also thought I would forever have the breathing and speech problems I had after awakening after the initial surgery. I also had initial problems eating and drinking.

23. While I have just about regained my voice back and am just about able to normally eat and drink, till this very day I still have to constantly clear my throat, I still must cough about every half-hour, and I get sharp headaches when I must cough, and I have a residual headache in between times I have to cough.

24. TDCJ's medical personnel have prescribed medications for what I am still going through in ¶ 23, but the medications do **NOT** help at all.

25. I am scheduled to go to the hospital **AGAIN** in May 2017.

26. When I began as an SSI in MICHAEL's ad. seg., I was never told by any TDCJ staff member that TDCJ had a policy on properly feeding ad. seg. inmates; I was under the impression that because I seen the other MICHAEL Unit ad. seg. SSIs helping floor officers feed ad. seg. inmates, and because the "Safety sheet" in ¶ 6 said something about me having to do what ad. seg. guards tell me, and because in 2010 when I was assigned to work in the ad. seg. kitchen I seen ad. seg. SSIs help floor officers feed ad. seg. inmates, and because floor officers told me to help them feed, I had to help floor officers feed ad. seg. inmates.

27. Additionally, there was never any posted rule prohibiting SSIs from helping floor officers feed ad. seg. inmates, and neither

I, nor any other SSI that I know of, ever received any disciplinary case for helping floor officers feed ad. seg. inmates.

28. Hensley had just begun working in MICHAEL's ad. seg. about a few weeks before I was stabbed by Sanchez, and Hensley fed in the way described in ¶¶ 8, 9, and 10 because that is how he was trained to feed ad. seg. inmates.

29. I was **NOT** the first individual to ever get assaulted/attacked by an ad. seg. inmate through an opened food slot door on the MICHAEL Unit, or in TDCJ-CID's Region Two, or in the entire TDCJ.

30. Various people get assaulted/attacked by ad. seg. inmates through opened food slot doors all throughout TDCJ.

31. Sanchez was in MICHAEL's ad. seg. after being transferred there due to him stabbing an officer in the eye through Sanchez's opened food slot door when Sanchez was **ON ANOTHER** TDCJ-CID's Unit's ad. seg. building.

32. Despite people getting hurt by ad. seg. inmates through opened food slot doors, Defendant Sims allowed floor officers on her shift to feed ad. seg. inmates in the way Hensley did in ¶¶ 8, 9, and 10, and Sims allowed them to do so un-supervised.

33. Despite knowing people get hurt by ad. seg. inmates through opened food slot doors, Defendant Funai allowed floor officers in MICHAEL's ad. seg. (where he was in charge of) to feed ad. seg. inmates in the way Hensley did in ¶¶ 8, 9, and 10, and Funai allowed them to do so un-supervised.

34. Despite knowing people get hurt by ad. seg. inmates through opened food slot doors, Defendant Baker allowed floor officers

in MICHAEL's ad. seg. (where he was Senior Warden of MICHAEL) to feed ad. seg. inmates in the way Hensley did in ¶¶ 8, 9, and 10, and Baker allowed them to do so un-supervised.

35. Despite knowing people get hurt by ad. seg. inmates through open-ed food slot doors, Defendant Scott allowed floor officers within TDCJ-CID's Region Two (where he was Regional Director of) to feed ad. seg. inmates in the way Hensley did in ¶¶ 8, 9, and 10, and Scott allowed them to do so un-supervised.

36. Despite knowing people get hurt by ad. seg. inmates through open-ed food slot doors, Defendant Stephens allowed floor officers to feed ad. seg. inmates in the way Hensley did in ¶¶ 8, 9, and 10, and Stephens allowed them to do so un-supervised.

37. Despite knowing people get hurt by ad. seg. inmates through open-ed food slot doors, Defendant Livingston allowed floor officers to feed ad. seg. inmates in the way Hensley did in ¶¶ 8, 9, and 10, and Livingston allowed them to do so un-supervised.

38. TDCJ-CID's Administrative Directive (AD)-03.50 § IV. F (Meals) (revised March 2012), says: "...Safety precautions shall be foll-owed in serving meals (to ad. seg. inmates) pursuant to PO-07.006, 'Administrative Segregation Officer,'" but after each of the supervisory defendants knowing about ¶ 30, within their respect-ive areas of responsibility none of the supervisory defendants did anything to ensure such safety precautions were followed.

39. PO-07.006, 'Administrative Segregation Officer' is not made available to SSIs working in ad. seg., and it is not made avail-able to any inmate that I know of.

40. The supervisory defendants' failure in taking reasonable meas-

ures within their respective areas of responsibility, to prevent any ad. seg. inmate (in this case, Sanchez) from attacking/assaulting any ad. seg. SSI (in this case, me) through an opened food slot (whether at "chow time" or whenever ad. seg. food slots are opened) constituted deliberate indifference to, and callous disregard for, the safety of SSIs like me.

41. Each of the defendants had actual knowledge of a serious risk to the safety of SSIs like me in light of each of the defendants' knowledge about ¶ 30 and AD-03.50 § IV.F's directive that "...Safety precautions shall be followed in serving meals..." to ad. seg. inmates.

42. I have declarations from fellow inmates who either did time in ad. seg. or who worked as an ad. seg. SSI on various Units all throughout TDCJ.

43. Each said declaration shows that, in light of the supervisory defendants' actual knowledge of ¶¶ 30 and 41, within their respective areas of responsibility the supervisory defendants gave/give tacit authorization to their subordinates to allow floor officers to feed as explained in ¶¶ 8, 9, and 10, and thus ad. seg. SSIs like me are deprived our right to reasonable safety under the Eighth Amendment to the United States Constitution.

44. Each of the defendants, within their respective areas of responsibility, either were plainly incompetent to, or knowingly violated my federal right to reasonable safety as an ad. seg. SSI.

45. At all times mentioned in this complaint each defendant acted

Page 4H

under the color of State law.

**Plaintiff invokes this Court's supplemental
jurisdiction under 28 U.S.C. § 1367**

46. At the time Sanchez stabbed me, all of the defendants were em-
ployees of TDCJ and are therefore liable to damages pursuant to
Tex. Gov't. Code Ann. § 497.096 because each defendant acted
with intentional, willful, or wanton negligence or conscious
indifference, or reckless disregard for my safety when they each
failed to properly implement and/or enforce AD-03.50 § IV.F
(Meals) within their respective areas of responsibility.

47. Within their respective areas of responsibility, each defend-
ants' acts or omissions rose to the level of gross negligence.

C. Has any court ever warned or notified you that sanctions could be imposed?          _____YES __X__ NO

D. If your answer is "yes", give the following information for every lawsuit in which warning was imposed. (If more than one, use another piece of paper and answer the same questions.)

    1. Court that imposed warning (if federal, give the district and division): _____

    2. Case Number:_____

    3. Approximate date warnings were imposed:_____

Executed on: <u>3-23-2017</u>
             DATE

CHRISTOPHER TORRES, Pro Se
_____
        (Signature of plaintiff)

## PLAINTIFF'S DECLARATIONS

1. I declare under penalty of perjury all facts presented in this complaint and attachments thereto are true and correct.
2. I understand if I am released or transferred, it is my responsibility to keep the Court informed of my current mailing address and failure to do so may result in the dismissal of this lawsuit.
3. I understand that I must exhaust all available administrative remedies prior to filing this lawsuit.
4. I understand I am prohibited from bringing an *in forma pauperis* lawsuit if I have brought three or more civil actions in a Court of the United States while incarcerated or detained in any facility, which lawsuits were dismissed on the ground they were frivolous, malicious, or failed to state a claim upon which relief may be granted, unless I am under imminent danger of serious physical injury.
5. I understand even if I am allowed to proceed without prepayment of costs, I am responsible for the entire $350 filing fee and costs assessed by the Court, which shall be deducted in accordance with the law from my inmate account by my custodian until the filing fee is paid.

Signed this <u>Twenty-Third</u> day of <u>March</u>, 20 <u>17</u>.
         (Day)            (month)       (year)

CHRISTOPHER TORRES, Pro Se
_____
        (Signature of plaintiff)

**WARNING: The Plaintiff is hereby advised any false or deliberately misleading information provided in response to the following questions will result in the imposition of sanctions.  The sanctions the Court may impose include, but are not limited to monetary sanctions and/or the dismissal of this action with prejudice.**

March 23rd, 2017

TO:  David Maland,
     CLERK
     U.S. District Court,
     Eastern District of Texas,
     Tyler Division
     211 W. Ferguson
     Tyler, Texas 75702

FROM: Christopher Torres
      #1142645
      WYNNE Unit
      810 F.M. 2821
      Huntsville, TX 77349

RE:   42 U.S.C. § 1983 complaint

Dear Clerk:

     Greetings. Enclosed is one original and one copy of my § 1983
complaint I request to be filed with this Court.

     Also enclosed is my Application to proceed In Forma Pauperis.

Please file the said documents and please inform me what my

Case number is.

     Thank you.


     Respectfully submitted,

     CHRISTOPHER TORRES

     *Christopher Torres*

AFSM 6 RM HOM7 773
MON 27 MAR 2017 PM6

CHRISTOPHER TORRES
# 1142645
WYNNE Unit
810 Fm 2821
Huntsville, TX 77349

DAVID MALAND,
CLERK
U.S. District Court,
Eastern District of Texas,
Tyler Division
211 W. Ferguson, Rm # 106
Tyler, TX 75702